Max J. Brandenstein et al., copartners, trading as M.
J. Brandenstein & Company, Appellants, v. Geo. Ras-
mussen Company, Appellee.

Gen. No. 20,747.    (Not to be reported in full.)

Appeal from the Municipal Court of Chicago; the Hon. HARRY
OLSON, Judge, presiding. Heard in the Branch Appellate Court at
the October term, 1914. Affirmed. Opinion filed May 11, 1915.
Rehearing denied May 25, 1915.

### Statement of the Case.

Action of assumpsit in the first class by Max J.
Brandenstein, Manfred Brandenstein and Edward
Brandenstein, copartners, trading as M. J. Branden-
stein & Company, plaintiffs, against Geo. Rasmussen
Company, a corporation, defendant.

One Alfred Adelsdorfer was the manager of plain-
tiffs' business, and George Rasmussen and W. Mat-
thiesen were respectively the president and treasurer
of the defendant. The action was brought on two
written instruments or notes, one of which is as fol-
lows:

"Chicago, 4/12/1913.

Geo. Rasmussen Company hereby agrees to pay to
M. J. Brandenstein & Co., one thousand dollars on the
12th day of June, 1913, in part settlement of a certain
carload of coffee damaged in the flood, while in transit
from New York.

(Signed)    GEO. RASMUSSEN COMPANY,
GEO. RASMUSSEN, Pres.
W. MATTHIESEN, Treas.''

The other instrument was the same except that the
date of maturity was August 12, 1913. Plaintiffs
claimed that the sum of $2,017.50 was due them. The
defendant's defense, as stated in its affidavit of merits,
was in substance, that plaintiffs represented to defend-
ant that plaintiffs had delivered to defendant, at New

York City, one carload of coffee, to wit, 245 bags of coffee, that said coffee was the property of defendant after said delivery at New York City, that said coffee had been damaged or destroyed while in transit from New York City to Chicago, and that defendant had become liable and was indebted to plaintiffs for said coffee; that defendant, relying upon the representation of plaintiffs that they had delivered the coffee to defendant at New York City, executed the two instruments sued upon in part payment of the coffee; that afterwards defendant learned and states the fact to be that said representation was false and untrue; that plaintiffs did not deliver said coffee, or any part thereof, to defendant at New York City, or elsewhere; that defendant was not indebted in any sum to plaintiffs at the time of executing said instruments either for said coffee or for any other matter or thing; that said instruments were made without any good or valuable consideration, that the consideration therefor has wholly failed, and that said instruments were obtained by false representations.

The facts as disclosed from the evidence are, in substance, as follows: Between February, 1911, and February, 1913, defendant had purchased various lots of coffee from plaintiffs. The first two shipments were made early in the year 1911, upon the understanding that defendant was to have the money in New York to pay for the coffee before the shipments were made to defendant. In March, 1911, George Rasmussen, while in New York, told Adelsdorfer that it was too expensive for defendant to have its money in New York before the coffee left New York, and it was thereupon agreed that future shipments to defendant should be made upon "draft against documents," and that defendant would pay the drafts upon presentation in Chicago. Several lots of coffee were afterwards shipped to defendant and paid for in this manner. Some time during February, 1913, Rasmussen called

on Adelsdorfer in New York and as a result of the interview defendant contracted to purchase the coffee in question, which at that time was in transit and not yet received by plaintiffs. It was agreed that defendant should pay plaintiffs what the coffee had cost plaintiffs, plus a commission or profit to plaintiffs of 15 cents per bag, and plus all charges for insurance, etc., and for the handling of the coffee until it was put on the train, and that the shipment of the coffee to defendant at this total price should be "f. o. b. New York." In due time the coffee arrived in New York, and on March 18, 1913, plaintiffs received from the Old Dominion Steamship Company in New York a so-called "order bill of lading," in which the steamship company acknowledged the receipt in apparent good order of 245 bags of coffee, "consigned to order of M. J. Brandenstein & Co. Destination, Chicago. State of Ills. Notify Geo. Rasmussen Co. * * * at Chicago, * * * Route Norfolk & Western, % Wabash R. R." On the face of said bill of lading it was stated that "the surrender of this original order bill of lading properly endorsed shall be required before the delivery of the property."

Plaintiffs indorsed in blank the bill of lading "M. J. Brandenstein & Co.," and, on March 20, 1913, drew a sight draft for $5,040.17 on defendant payable to the order of the State Bank of Chicago, and inclosed the bill of lading and draft in a letter addressed to said bank, in which letter plaintiffs wrote: "We enclose herewith bill of lading for 245 bags coffee consigned to our own order at Chicago, with instructions to notify George Rasmussen Co. * * * We beg to enclose herewith our draft for $5,040.17, with exchange and collection charges on New York, on Messrs. George Rasmussen Co. Please deliver bill of lading only on payment of this draft, and remit proceeds to us." The word "only" in said letter was underlined in red ink. About the same time plaintiffs mailed to defendant at

Chicago a statement or invoice showing the total pur-
chase price of the coffee, including various incidental
charges and plaintiffs' profit therein itemized, to be
$5,040.17, and stating that the amount was "payable
net cash sight draft against shipping documents
through State Bank of Chicago. In New York Funds."
When the State Bank (with which bank defendant then
did its banking business) received the draft, bill of
lading and letter from plaintiffs, defendant was so ad-
vised by telephone by the bank, and defendant re-
quested the bank to hold the draft and bill of lading
until the arrival of the coffee in Chicago. This the
bank agreed to do. It does not appear that the draft
and bill of lading were formally presented to defend-
ant or that any officer or representative of defendant
saw the bill of lading. The coffee never arrived at
Chicago. While in transit in the State of Ohio it was
greatly damaged, if not practically destroyed, by rea-
son of the Ohio flood of 1913.

On April 2, 1913, defendant wrote plaintiffs to the
effect that the coffee had not yet arrived in Chicago,
that defendant had had the Wabash Railroad "trace
from this end," that the coffee when last heard from
was in Ohio, "delayed evidently on account of flood,"
and suggesting that plaintiffs "start tracer" from
their end, to which plaintiffs replied, on April 4th,
that they would start such tracer, and that Adelsdor-
fer would arrive in Chicago on April 11th or 12th. On
April 11th defendant received a telegram from plain-
tiffs, dated April 10th, that plaintiffs had just been
advised that the car containing the coffee had been
caught in the flood and was at Toledo, Ohio, and had
been refused by the Wabash Railroad because "con-
tents hot and steaming causing stench." The tele-
gram further stated: "As the coffee is yours we have
taken no action. If we can be of any assistance to you
by sending a man to Toledo to sell the coffee for your
account at your expense, telegraph us at once and we

will be only too pleased to accommodate you.'' On April 11th defendant sent a representative, one Massmann, to Toledo to investigate, and he arrived there on April 12th. On the morning of April 11th Adelsdorfer arrived in Chicago and met Rasmussen by appointment. Adelsdorfer told Rasmussen that the coffee belonged to defendant, that he wanted the draft paid, and that if it was not paid plaintiffs would sue defendant. Rasmussen replied that he would do nothing until he had received word as to the coffee from Massmann, and until he had ascertained whether or not the coffee was defendant's coffee, and arrangements were made for another meeting on the following day. On the morning of April 12th Massmann at Toledo communicated with defendant over the long distance telephone, informing defendant that he had seen the coffee, that it was ''practically worthless,'' and that ''not more than $100 could be realized upon it.''

In the afternoon of April 12th Adelsdorfer met Rasmussen and Matthiesen in Chicago, and further negotiations were had. Adelsdorfer testified, in substance, that at this interview he again stated that if defendant did not pay for the coffee immediately plaintiffs would bring suit to recover the purchase price; that he further stated that the coffee was shipped f. o. b. New York and that it was defendant's coffee; that he showed a letter which he had just received from plaintiff's New York attorney in which the said attorney expressed the opinion that the title to the coffee had passed in New York and that defendant was liable for the full amount; and that Rasmussen stated during the interview that he had consulted a Chicago attorney who had advised him to settle without taking the matter into court. Rasmussen denied making any such statement or that he had consulted an attorney. Rasmussen further testified, in substance, that at this interview he again expressed doubt as to whether the coffee was defendant's coffee; that thereupon Adels-

dorfer said: "Of course it is your coffee; you bought the coffee f. o. b. New York, and there is no question but it is your coffee; I have seen my lawyer in New York about it;" that Adelsdorfer further said: "I feel sorry for you people: If I start suit its going to cost me some money; if I can settle this thing peaceably I am willing to allow you whatever it might cost for lawyer's fees and so on"; that finally Adelsdorfer suggested an allowance of $500; that then he (Rasmussen) said: "If you will allow us $1,000, I will think it over and we can probably make a settlement on that basis;" that Adelsdorfer thereupon said that he would have to wire his office in New York and that as soon as he received a reply he would advise defendant; and that later, about three o'clock in the afternoon, Adelsdorfer called at defendant's place of business and further negotiations were had which resulted in the drawing of the notes sued upon and other papers. Matthiesen, treasurer of defendant, who was present at said interview on the forenoon of April 12th testified that Adelsdorfer then "told us that the coffee belonged to us and we had to settle, that he was going to sue for the amount of the coffee, that it was bought f. o. b. New York, and that in consequence we had to pay for it;" that he (Matthiesen) believed Adelsdorfer's statements that the coffee had been shipped f. o. b. New York and the coffee belonged to defendant, "otherwise we would not have signed the notes." Rasmussen also testified that he believed Adelsdorfer's said statements and that those statements were "the basis on which I made the settlement." Both Rasmussen and Matthiesen testified that prior to signing the notes they had not seen the bill of lading, which was still with the State Bank. Adelsdorfer also testified that at the interviews with Rasmussen or Matthiesen nothing was stated as to the bill of lading except that after the papers were signed he promised to arrange to have the same turned over to defendant by the bank, and

that he (Adelsdorfer) did not at any time inform any person connected with defendant who was the consignee named in the bill of lading.

At the meeting of the parties at defendant's place of business on the afternoon of April 12, 1913, the two notes sued upon were executed and delivered to Adelsdorfer, and two other like notes, maturing at dates subsequent to the commencement of the present action, were also executed and delivered. Adelsdorfer, in the name of plaintiffs, signed and delivered to defendant a receipt to the effect that plaintiffs had received from defendant four notes, amounting to $4,040.17, "as full settlement for a certain carload of coffee damaged in the flood while in transit from New York. Whatever compensation Geo. Rasmussen Co. receives by sale or salvage, or by settlement with railroad company, M. J. Brandenstein & Co. is entitled to 20 per cent. thereof." On April 17th defendant received the bill of lading from the State Bank, the bank having been instructed by plaintiff's letter, dated April 14th, to turn the same over to defendant, and the bank returned to plaintiffs said draft of $5,040.17. Both Rasmussen and Matthiesen testified that they first learned that defendant was not the consignee named in the bill of lading when they received the bill of lading from the bank. Defendant never made any attempt to get the coffee from the railroad company, or to get any money from the railroad company, and never realized anything by way of salvage on the coffee. Rasmussen further testified that after the bill of lading was received from the bank and he had ascertained therefrom that plaintiffs were the consignees named therein, he for the first time consulted an attorney, who expressed it as his opinion that the coffee was not defendant's coffee at any time. The first note matured on June 12, 1913, and, upon the same being presented to defendant for payment, defendant wrote plaintiffs that it would not pay the note, or any

of the other notes, for the reasons, as stated in substance, that the defendant had been induced by false and fraudulent representations to sign the notes and that they were without consideration. After the second note matured plaintiffs commenced the present suit.

BRECHER & CHINDBLOM, for appellants; LAMBERT KASPERS, of counsel.

WILLIAM B. JARVIS, for appellee.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

### Abstract of the Decision.

1. SALES, § 200*—*when indorsement of bill of lading in blank insufficient delivery.* Where the seller consigns goods to himself and forwards a bill of lading, indorsed in blank and with draft attached, to a bank with directions that the bill be delivered only on payment of the draft, the ownership of the goods remains in the seller until payment of the draft, and the risk of damage to the goods while in transit rests upon the seller.

2. BILLS AND NOTES, § 52*—*when compromise of invalid claim insufficient consideration.* Evidence examined and *held* sufficient to support finding that consideration of notes in suit was compromise of claim having no valid existence and therefore insufficient.

3. BILLS AND NOTES, § 443*—*when evidence sufficient to show fraud and misrepresentation.* Evidence examined and *held* to warrant finding that defendants were induced to sign notes in suit through fraud and misrepresentations of plaintiff's manager.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.