Louise Stone Hubbard, Executrix of the Estate of Horace G. Stone, Deceased, Defendant in Error, v. J. Edgar Settles and Homer E. Shaw, Plaintiffs in Error.

Gen. No. 29,102.

1. ACCORD AND SATISFACTION—*incompetency of evidence of prior transactions and note to impeach extension agreement.* Where a promissory note was given and payments made thereon and, a dispute having arisen, a contract of accord and satisfaction and of extension of time for payment was executed under which all defenses to the original note were waived, and there was nothing to show fraud in the subsequent agreement, evidence offered in a suit upon the note and the agreement to show that the original note was procured by fraud and without consideration was irrelevant and immaterial as well as incompetent as tending to vary the terms of the subsequent written agreement.

2. HARMLESS ERROR—*when error in computing verdict and judgment.* In an action upon a contract where an error was made in computing the verdict and judgment entered but upon discovery of the error an order was entered setting it aside and ordering that a prior judgment by default stand in full force and effect, the latter judgment being for less than the verdict, such error, if any, will not justify a reversal on behalf of defendants.

3. APPEAL AND ERROR—*when damages not allowable on error as for delay.* Where on a trial a question of law was precipitated which the Appellate Court has seen fit to consider, damages will not be allowed to plaintiff on the ground that the writ of error was sued out by defendants only for delay.

Error by defendants to the Superior Court of Cook county; the Hon. JOSEPH B. DAVID, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1924. Affirmed. Opinion filed February 11, 1925. *Certiorari* denied by Supreme Court (making opinion final).

LE FORGEE, SCHROEDER & TATE, for plaintiffs in error; MURPHY O. TATE, of counsel.

WILLIAM GARNETT, for defendant in error; FRANCIS W. WALKER, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

This is an action in assumpsit, brought by Horace G. Stone (since deceased, and his executrix, Louise Stone Hubbard being substituted in his stead) against the defendants, J. Edgar Settles and Homer Shaw, upon a promissory note dated April 1, 1918, and upon a written agreement of extension of the note, dated August 1, 1921. After summons had been issued and served, and a declaration filed, the court, on February 8, 1923, upon the defendants' default, entered judgment for the plaintiff against the defendants in the sum of $7,041.21 and costs. On March 3, upon motion of the defendants and after the service of notice and the filing of an affidavit, the defendants were given leave to file pleas instanter, and the judgment theretofore entered was ordered to stand as security. There was a trial with a jury, and at the close of all the evidence a motion was made on behalf of the plaintiff to strike out all the testimony on the part of the defendants. That motion was allowed. The court then instructed the jury to find the issues for the plaintiff and assess the plaintiff's damages in the sum of $7,128.38. That was done and judgment entered thereon. Motions for a new trial and in arrest of judgment were made and overruled. On May 5, 1923, on motion of the defendants, the judgment just referred to was vacated and it was ordered that the original judgment of February 8, 1923, stand in its stead. This writ of error is prosecuted to reverse that judgment.

At the trial there was offered in evidence the promissory note and a written instrument purporting to be both an accord and satisfaction of certain disputes and an extension of the original note; and the testimony of William Garnett for the plaintiff, and that of O. M. Carter and Homer E. Shaw for the defendants.

The substance of the promissory note is as follows: "Chicago, Ill., April 1, 1918. For and in consideration of the sum of One Dollar and of services rendered by Horace G. Stone, we, the undersigned, hereby covenant and agree to pay to said Stone the sum of $9,690.00 in manner and at the following times." The note then recites that $1,000 in cash was paid that day to Stone, and that the balance of the note, $8,690, was to be paid in monthly instalments of $500, with the exception of the last payment, which was to be $690. Indorsements on the note showed that, in addition to the original cash payment of $1,000, there was paid to Stone, subsequently, five instalments each of $500, running from June 1, 1918, to and including February 1, 1919; also, $60 paid on December 1, 1920, and $690 paid on February 1, 1921. The concluding part of the note is as follows: "With interest payable semi-annually at 6% per annum, on all sums from time to time remaining unpaid from and after Oct. 1, 1918." It was signed, "H. E. Shaw, J. E. Settles, W. G. Hopkins." Hopkins having died, only Shaw and Settles were sued.

The instrument of settlement and accord and satisfaction, and of extension, is as follows:

"August 1, 1921. Disputes having arisen with regard to the note of which annexed is a copy, it is agreed that as a settlement and as an accord and satisfaction of said disputes, that the payment of said note is hereby extended to August 1, 1922, at which date we, H. E. Shaw and J. E. Settles, agree to pay it in full.

"The amount agreed upon as due on August 1, 1921, is Sixty-four Hundred Fifty-one and 94/100 ($6,451.94) Dollars with interest thereon after August 1, 1921, at the rate of six (6) per cent per annum until paid.

"And in consideration of such extension of one year, we, the undersigned, do hereby waive any and all defenses we now have or may be supposed to have to the payment of said note and interest as above

stated." That instrument was signed, "H. E. Shaw, J. E. Settles."

William Garnett, a lawyer, testified for the plaintiff that he knew the signatures to the note; that he knew Stone's handwriting; that the initials H. G. S. were in Stone's handwriting; also the payments marked on the face of the note; that W. G. Hopkins, one of the three signers of the note, had died; that he, the witness, drew the extension agreement himself and computed the amount therein mentioned; that the signatures to the extension agreement are those of Shaw and Settles; that a copy of the original note was attached to the extension agreement at the time the extension agreement was signed; that the principal and interest due at the date of the trial was $7,128.38.

After the introduction of the note and instrument of accord and satisfaction and extension, and the plaintiff had made out, as it is admitted by counsel for the defendants in their brief, a prima facie case, the defendants undertook to introduce evidence, as they claim, to show that the note in question had been given pursuant to intimidation and threats made by the plaintiff's testator. Owing to the death of Stone, the defendants Shaw and Settles were incompetent as witnesses.

One Carter, called on behalf of the defendants, testified that he was a consulting engineer; that he knew Stone for 40 years, until the time of his death, and that he also knew the defendants Shaw and Settles; that Stone was his, the witness', attorney, and that he introduced Stone to Shaw and Settles; that at that time he, the witness, had purchased 35,000 acres of land in Arizona under a contract of sale; that he sold that contract of sale, not the land itself, to Shaw and Settles, and some other men; that the purchaser stepped into his shoes; that he was not certain whether he was present at the time of the execution of the

note in question; that he does not think he saw any money paid by Shaw or Settles to Stone. When asked to tell the conversation, if any, that took place between Stone, Shaw and Settles on that occasion, counsel for the plaintiff objected, and the court sustained the objection, apparently for the reason that payments had been made on the note and the extension agreement executed. After some discussion between counsel for the defendants and the court, the witness was allowed to testify further. He then testified that he went to Stone and employed him as his, the witness', attorney as against the rights of Settles and Shaw, and also against the rights of the people from whom he, the witness, bought the land; that when he sold the contract he, himself, prepared the contract of sale and did everything at that time without legal advice, but that some matters came up and he concluded to consult with an attorney, and so employed Stone, and paid him $500 in the month of January and a similar amount later; that Shaw and Settles had nothing to do with that; that he then introduced Stone to the defendants so that they might know that Stone was acting for him, the witness; that he had Stone go to Terre Haute, Indiana, where one of the principals lived; that he paid Stone for that, as he represented him, the witness; that when Stone came back, apparently in 1918, either at the witness' office or at the Union League Club, he, Stone, said to Shaw, Settles and Hopkins, "You are going to make a whole lot of money out of this purchase and I want $10,000''; that Shaw, Settles and Hopkins were the purchasers of the contract; that they turned to him, the witness, and wanted to know what he meant by introducing a man like that into the case; that he told them he was not responsible for that; that Stone intimated to them that if he were not employed he probably could destroy the contract so far as permitting them to make the sale to their friends was concerned, and

said, "that if they did that he felt that they ought to take out anything that had to be paid him out of what they owed me, that I was responsible for it, that he had never rendered them any services"; that then there was some conversation back and forth, and finally one of them said to Stone, "Well, if you are going to act this way, perhaps we had better have you on our side rather than against us, and will you render services in the future, if you have rendered none yet?" that so far Stone had not been their attorney at all, and had rendered no services; that Stone answered that he would; that when he, the witness, bought this property, they wanted him to manage it for them, but he refused; that they did not think he could sell it; that when they found out he could sell it, they, the people in Indiana, did not want it delivered; that he had had some dealings with them four years before that, and they owed him about $75,000; and when he sued them they put a million dollar mortgage against the property, and he never got anything and refused to serve them, but told them that he would buy the property from them; that that is how he happened to get this Arizona property. The witness testified, further, that he was present at another meeting; that the people who owned the land were the kind that would repudiate their contract, and had entered suit in Chicago, and at the meeting in question, Stone was asked to defend it; that Stone said it would be better to have Judge Sears do it, and that Judge Sears was, accordingly, employed. He further testified that in the first conversation between Stone and the defendants Stone told them "that it would be cheaper to pay the $10,000 than to have him smash the deal," and, when they objected, he said to them that if he went over to the other side he could block their deal, and it would be cheaper to pay him than to have their deal ruined.

The defendant Shaw was called on behalf of the

defendants, and counsel for the defendants undertook to examine him concerning his business transactions with Stone in 1918, and when the witness was asked whether or not there were any services ever rendered by Stone, and whether or not the witness paid any money under threats, objections were made and sustained by the court.

Counsel for the defendants argue that they were entitled to examine Shaw in regard to such matters, in order to show fraud and extortion in obtaining the note in question. The court, however, ruled that owing to the death of Stone, the witness was incompetent, and the same would apply to Settles.

A motion was then made on behalf of the plaintiff to strike out all the testimony for the defendants. That motion was allowed, and the court then instructed the jury to find a verdict for the plaintiff and assess the plaintiff's damages at the sum of $7,128.38. A verdict was rendered accordingly and judgment entered thereon.

It is contended for the defendants that the court erred in striking out the evidence which was introduced on behalf of the defendants, and in refusing proffered testimony which it was claimed would tend to show that the original note was procured by fraud. It is not denied that the defendants executed the note in question in April, 1918, nor that the defendants made a first payment of $1,000, and five subsequent payments of $500 each, between June 1, 1918, and February 1, 1919, nor that the defendants in August, 1921, executed the accord and satisfaction and the extension agreement, but in opposition to that it is claimed for the defendants that the evidence they introduced and that which they proffered, and which was rejected, would tend to show that the original note was given without consideration. Although the defendants pleaded that not only the original note, but the accord and satisfaction and extension agree-

ment, were procured by fraudulent representations, no evidence was introduced, nor offered, tending to show that the written agreement of August 1, 1921, was obtained in any such way.

In our judgment neither the testimony that was admitted for the defendants nor that which was proffered and rejected was admissible to vary the contractual relations between the parties as evidenced by the written accord and satisfaction and extension agreement. The signed document of August 1, 1921, made a brand new contract between the parties, and the suit of the plaintiff is not, in its essence a suit upon the original note, but upon the written contract of August 1, 1921; and that contract being in writing, evidence as to the source of the original note as to what transpired when it came into being is not only irrelevant and immaterial, but incompetent, as tending to vary the terms of the written contract. *Linn v. Clark,* 295 Ill. 22. Wigmore on Evidence, sec. 2425. It is not necessary, therefore, to consider whether the testimony of Carter and Shaw, and what was proffered through them and rejected, tended to prove that the note in its inception was tainted with fraud. The cases cited on behalf of the defendants, *Brandenstein v. Rasmussen Co.,* 192 Ill. App. 545; *Skiles-Rearick & Co. v. Brooks,* 215 Ill. App. 500; and *Libby, McNeill & Libby v. Cook,* 222 Ill. 206, are not in point.

Considering the situation as it was at the close of all the evidence, the trial court was bound to allow the motion for the plaintiff and strike out all the evidence given for the defendants.

It is urged for the defendants that there was a variance between the verdict and the judgment. The verdict of the jury was for the plaintiff, and the damages were assessed at $7,128.38, and judgment was entered on that verdict, but when it was discovered that that judgment was not for the correct amount,

an order was entered setting aside that judgment and ordering the judgment which had been entered by default on February 8, 1923, for $7,041.21, to stand in full force and effect. The original error in the amount, as made, was not an unnatural one, but inasmuch as the final judgment was less than the amount of damages assessed by the jury in its verdict, it became somewhat in the nature of a remittitur, and being to the advantage of the defendants it cannot, with reason, be said that it was such an error as would justify a reversal. It was a trivial error, and was properly corrected within the term.

On behalf of the plaintiff, we are asked to allow damages on the ground that the writ of error was sued out by the defendants only for delay. As shown above, a question of law was precipitated which we have seen fit to consider and so we do not feel that we are entitled to grant the request.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

O'CONNOR, P. J., and THOMSON, J., concur.